**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CRAIG CANTER,** | |
| Plaintiff, | No. 1:18-cv-07375 |
| v. | Honorable Jorge L. Alonso |
| **AT&T UMBRELLA BENEFIT PLAN NO. 3, and AT&T SERVICES, INC. as Plan Administrator,** | |
| Defendants. | |

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants AT&T Umbrella Benefit Plan No. 3 (the "Plan") and AT&T Services, Inc. ("AT&T Services") file this Statement of Undisputed Material Facts In Support of Defendants' Motion for Summary Judgment and state as follows:

**I.      FACTS MATERIAL TO COUNT I – DENIAL OF STD UNDER ERISA AGAINST THE PLAN AND AT&T SERVICES AS PLAN ADMINISTRATOR**

**A.      The Plan.**

1.      The Plan, which is an employee welfare benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), provides eligible participants short-term disability ("STD") benefits through a component benefit program called the AT&T Midwest Disability Benefits Program ("Disability Program"). (**Appendix Exhibit A**. Administrative Record Sedgwick Considered Regarding Canter's Claim for STD Benefits ("AR") at AT&T.Canter 364, 373, 391 to 394, 418, 453.)

1

2.     AT&T Services is the Plan Administrator for the Plan that has sole and absolute

discretion to interpret provisions of the Plan:

> The Plan Administrator shall be the "named fiduciary" of the Plan and all Programs as defined in § 402(a)(2) of ERISA, unless the Company appoints a replacement. The Plan Administrator has the power and duty to do all things necessary to carry out the terms of the Plan. The Plan Administrator has the sole and absolute discretion to interpret the provisions of the Plan, to resolve any ambiguity in the terms of the Plan, to make findings of fact, to determine the rights and status of you and others under the Plan, to decide and resolve disputes under the Plan and to delegate all or a part of this discretion to third parties, who may be individuals and/or entities. To the extent permitted by law, such interpretations, findings, determinations and decisions are final, conclusive and binding on all persons for all purposes of the Plan and shall not be overturned, unless determined to be arbitrary and capricious pursuant to the final judgment in a court of law.

(AR at AT&T.Canter 370, 380.)

3.     The Plan Administrator delegated the fiduciary discretion to determine a

claimant's entitlement to STD benefits to Sedgwick Claims Management Services, Inc.

("Sedgwick"), the independent, third-party Claims Administrator. (AR at AT&T.Canter 441,

445.)

4.     The Plan reiterates that Sedgwick, the Claims Administrator, has complete

discretionary authority to determine whether a participant is entitled to any benefits under the

Disability Program and to conclusively interpret the terms and provisions of the Disability

Program.  (AR at AT&T.Canter 422, 426, 441 (Sedgwick has the "discretion and authority to

decide appeals" and "full and exclusive authority and discretion to grant and deny appeals under

the Program" and Sedgwick's decision is "final and conclusive").

5.     Under the Plan, an employee is considered disabled for the purposes of up to 52

weeks of STD benefits if Sedgwick, "at its sole discretion, determines that [the employee is]

2

disabled by reason of sickness, pregnancy, or an off-the job illness or injury that prevents [the employee] from performing the duties of [the employee's] job . . . with or without reasonable accommodation." (AR at AT&T.Canter 415, 421.)

6.      "Any claim of disability for the purposes of claims for STD benefits "must be supported by objective Medical Evidence" which is "[o]bjective medical information sufficient to show that the Participant is Disabled, as determined at the sole discretion of the Claims Administrator" and "includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession." (AR at AT&T.Canter 446.)

7.      "In general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability" under the Plan. (*Id.*)

8.      An employee seeking STD benefits is required to "periodically furnish satisfactory Medical Evidence . . . of Disability from [the employee's] Physician" and "[e]nsure that [the employee's] medical providers cooperate with [Sedgwick] to provide all necessary information to [Sedgwick] in a timely manner." (AR at AT&T.Canter 421.)

9.      Under the Plan, STD benefits are discontinued when an employee fails "to furnish objective Medical Evidence for [his] condition." (AR at AT&T.Canter 426.)

**B.      Canter Applies for and is Approved for STD Benefits from February 13, 2017 through July 6, 2017.**

10.      Plaintiff Craig Canter ("Canter") was employed as a Premises Technician for Illinois Bell Telephone Company, a Participating Company of the Disability Program (AR at AT&T.Canter 11, 394).

3

11.    Canter initially submitted a claim for STD benefits under the Disability Program on February 13, 2017, based on dizziness and headaches.  (*See* AR at AT&T.Canter 11.)

12.    As a Premises Technician, Canter's job duties included, among other things, stooping, crouching, and crawling, and using and/or wearing appropriate safety equipment and following established safety practices and procedures, and the physical requirements of the position of Premises Technician include, among other things, at times wearing a body belt and pouch with tools weighing about 15 pounds, ability to climb ladders up to 28 feet, ability to lift up to 80 pounds and work aloft with hand tools, and the ability to climb poles and ladders, drive a company vehicle, bend and kneel.  (*Id.*; *see also* AR at AT&T.Canter 164 to 165.)

13.    In support of his STD claim, Canter submitted medical notes from a February 7, 2017 visit with Tracy Denne, P.A. of Advocate Medical Group ("AMG"), where he complained of dizziness, persistent headaches, and right low back pain. (AR at AT&T.Canter 318 to 320.)

14.    He also submitted a discharge summary that he received from the Centegra Hospital Huntley Emergency Department later that day, where he had presented with episodic tension-type headaches that were poorly controlled, and had undergone a CT of his head without IV contrast.  He was given Neproxen for pain, and instructed to follow up with his health care provider if his condition did not improve. (AR at AT&T.Canter 321.)

15.    Canter also submitted medical notes from a February 11, 2017 visit with Dr. Moriah Bang, D.O. ("Dr. Bang"), also of AMG, where he complained of dizziness, persistent headaches, and low back pain. Dr. Bang referred him to a neurologist. (AR at AT&T.Canter 314 to 316.)

16.    Pursuant to this referral, Manisha Sahay, M.D. ("Dr. Sahay") from Northwest Neurology Ltd. ("Northwest Neurology") saw Canter for the first time on February 15, 2017, and

ordered diagnostic tests of an MRI of his brain both with and without contrast and an MRV of his head without contrast, writing a note that recommended Canter be excused from work due to dizziness until the test results were reviewed, and noting that Canter would be reevaluated in two weeks. (AR at AT&T.Canter 312, 324, 326; *see also* AR at AT&T.Canter 300 to 306.)

17. On February 22, 2017, Sedgwick approved Canter's claim for STD benefits from February 13, 2017 through March 14, 2017. (AR at AT&T.Canter 307 to 309; *see also* AR at AT&T.Canter 310 to 311.)

18. On March 8, 2017, Lisa Jackson, CNP ("Ms. Jackson") with Northwest Neurology saw Canter and noted that he continued to experience daily, off-and-on headaches with accompanying lightheadedness, and that he had pulled a muscle in his back, opining that the results of Canter's tests from February 15, 2017, were "unremarkable," the head CT he had at the emergency room was "normal," and noting that lab results from his emergency room visit were not available. (AR at AT&T.Canter 286 to 290.)

19. Ms. Jackson, overseen by Dr. Sahay, changed Canter's medication and recommended that he remain out of work until his next visit in four weeks. (AR at AT&T.Canter 288, 290.)

20. Based on this information, on March 15, 2017, Sedgwick approved Canter's STD benefits from February 13, 2017 until April 11, 2017. (AR at AT&T.Canter 283 to 284; *see also* AR at AT&T.Canter 281 to 282.)

21. On April 10, 2017, Ms. Jackson evaluated Canter again, and indicated that Canter's headaches had "nearly resolved" with the help of medication, but reported that Canter still complained of "lightheadedness and a mild headache with any physical exertion." (AR at AT&T.Canter 277 to 279.)

5

22.     Because Ms. Jackson, overseen by Daniele Anderson, M.D. ("Dr. Anderson"), had only recently increased Canter's medication dosage, she recommended that he continue the higher dose and call back in a week to report as to whether his lightheadedness had resolved, with a follow up visit in three or four weeks. (*See* AR at AT&T.Canter 278.)

23.     Based on this information, on April 12, 2017, Sedgwick extended Canter's STD benefits until May 10, 2017.  (AR at AT&T.Canter 274 to 275; *see also* AR at AT&T.Canter 272 to 273.)

24.     On May 8, 2017, Ms. Jackson evaluated Canter and noted that Canter's "headaches had improved significantly," but his "lightheadedness is worse." She recommended that he return in three to four weeks for a follow up visit. (*See* AR at AT&T.Canter 269 to 270.)

25.     Based on this information, on May 11, 2017, Sedgwick approved Canter's STD benefits until May 29, 2017.  (AR at AT&T.Canter 251 to 252; *see also* AR at AT&T.Canter 249 to 250.)

26.     On June 5, 2017, Ms. Jackson evaluated Canter who reported that he had received an acupuncture treatment and an herbal supplement that had helped his "lightheadedness, headaches, and motivation to get up and work," so Ms. Jackson, supervised by Dr. Anderson, instructed Canter to continue his acupuncture treatments among other things and scheduled him for a follow-up visit in three to four weeks. (AR at AT&T.Canter 244.)

27.     Based on this information, on June 8, 2017, Sedgwick approved Canter's STD benefits until July 6, 2017. (AR at AT&T.Canter 240 to 241; *see also* AR at AT&T.Canter 238 to 239.)

**C.    Sedgwick Discontinues Canter's STD Benefits After July 6, 2017.**

28.    In response to Sedgwick's request for an update on Canter's condition, on July 10, 2017, Ms. Jackson submitted notes from her July 3, 2017 appointment with Canter.  (AR at AT&T.Canter 232 to 233.)

29.    On July 3, 2017, Canter reported he had "significant improvement of his headaches" following regular acupuncture treatment and taking herbal supplements, such that he reported that he now only got "milder headaches lasting an hour or so every three days," but did not treat them, and although he reported becoming short of breath and dizzy after exertion such as mowing the lawn, he reported his persistent dizziness had resolved and he could do normal activities of daily living ("ADLs") without difficulty. (AR at AT&T.Canter 232 to 234.)

30.    Accordingly, Ms. Jackson, overseen by George Katsamakis, M.D. ("Dr. Katsamakis"), instructed Canter to continue taking propranolol and acupuncture treatment, and referred Canter back to his primary care physician, Dr. Bang, for follow-up on his symptoms arising with exertion, as these could be cardiopulmonary, and extended the follow-up period for Canter's next appointment out to two to three months. (AR at AT&T.Canter 234.)

31.    On July 14, 2017, Sedgwick referred Canter's file to an independent medical reviewer to gather more information to help evaluate his ongoing entitlement to disability benefits because his "exam findings [were] within normal limits" and Canter "denie[d] poor balance, coordination."  (AR at AT&T.Canter 55.)

32.    Katherine Duvall, M.D., M.P.H., M.S ("Dr. Duvall") of Network Medical Review Co. Ltd. ("Network Medical Review"), who is Board Certified in Occupational Medicine, examined Canter's file at Sedgwick's request and provided a written report of her findings on July 27, 2017. (AR at AT&T.Canter 226 to 228.)

7

33.     Dr. Duvall reported that she called Northwest Neurology to speak with Ms. Jackson and Barry H. Bikshorn, MD (a supervising physician at Northwest Neurology), and left a message asking for a return call, but did not receive one.  (AR at AT&T.Canter 226.)

34.     Dr. Duvall reviewed Canter's entire medical record and determined that Canter was not disabled as there were "no objective observables to substantiate severity and inability to perform job duties" and that "from an Occupational Medicine perspective, [Canter was] capable of performing his normal heavy job including duties of lifting, driving, bending, and stooping as a Premises Tech[nician], without restrictions/limitations from 7/07/17 to present."  (AR at AT&T.Canter 226 to 227.)

35.     With regard to Canter's headaches, Dr. Duvall noted that since the last time Canter's STD benefits had been extended, there had been "significant improvement" such that Canter only had a mild headaches every few days that did not require treatment by his provider. Likewise, with regard to Canter's dizziness, Dr. Duvall noted that Canter's "[d]izziness had resolved, neck pain improved, . . . back pain resolved," and that even though Canter made "[c]omplaints of shortness of breath and dizziness with exertion," there were no abnormalities on exam and he was in no acute distress, and "the objective findings . . . [were] insufficient to support [Canter's] inability to do his usual heavy job or need restrictions and limitations for [the] review period."  (AR at AT&T.Canter 227.)

36.     After reviewing Dr. Duvall's report, the medical information of record, and the terms of the Disability Program, on August 7, 2017, Sedgwick made the decision to deny Canter STD benefits from July 7, 2017 onward.  (AR at AT&T.Canter 222 to 223; *see also* AR at AT&T.Canter 216 to 221.)

8

37.     Specifically, Sedgwick reminded Canter that the Disability Program required him to furnish "objective Medical Evidence" for his condition and that his benefits could be discontinued, in the Claims Administrator discretion, if he failed to furnish that evidence, before summarizing the evidence provided and noting that "[c]linical information provided and reviewed does not document a severity of your condition(s) that supports your inability to perform your essential job duties as a Premise[s] Technician." (AR at AT&T.Canter 216 to 217.)

38.     After the denial of STD benefits, Sedgwick received additional medical records relating to Canter's condition on September 1, 2017 which showed that Canter had presented to Dr. Bang with AMG on July 19, 2017 complaining of dizziness and headaches when exerting himself since February.  (*See* AR at AT&T.Canter 190 to 204.)

39.     Dr. Bang ordered testing, including routine fasting labs, a stress echocardiogram, and a chest x-ray, and referred Canter to a pulmonologist to "make sure [Canter's] heart and lungs [were] okay since there'[d] been thorough negative neuro workup."  (AR at AT&T.Canter 200.)  The testing results were normal, with the exception of slightly elevated chloride levels, low HDL cholesterol, high triglycerides, and a high cholesterol to HDL ratio.  (AR at AT&T.Canter 191 to 197.)

40.     Even though it received the documentation after it had already made its initial decision regarding his ongoing STD benefits, Sedgwick reviewed the information from AMG but determined that the records " did not provide clinical evidence to support disability," and did "not alter [the] previous denial decision" and informed Canter of that determination on September 12, 2017.   (AR at AT&T.Canter 185 to 189.)

9

**D.      Canter Appeals the Denial of STD Benefits.**

41.      On September 20, 2017, Canter appealed Sedgwick's initial denial of STD

benefits after July 7, 2017, stating that he was appealing the decision because he followed all of

his doctor's instructions and he had not been released back to work.  (AR at AT&T.Canter 183 to

184.)

42.      On September 22, 2017, in support of his appeal, Canter submitted records from

his visit to pulmonologist, Dennis F. Kellar, M.D. ("Dr. Kellar") on a referral from Dr. Bang,

(AR at AT&T.Canter 167 to 171) (which reflected a normal physical examination and a normal

"PFT" (Pulmonary Function Test)), the results from his stress echocardiogram (AR at

AT&T.Canter 172 to 174) (which were normal), and an additional copy of the office notes from

his last visit with Ms. Jackson on July 3, 2017. (AR at AT&T.Canter 175 to 177.)

43.      Once again to gather more information to help evaluate Canter's ongoing

entitlement to STD benefits in light of his appeal, Sedgwick elected, in its discretion, to engage

two independent medical reviewers through Network Medical Review who were Board Certified

in three areas of medical specialty - Internal Medicine, Pulmonary Disease and Neurology – to

review Canter's medical records and offer their opinion as to whether, as required by the terms

of the Plan in order to receive STD benefits, Canter could not perform the duties of his job with

or without reasonable accommodation.   (AR at AT&T.Canter 147 to 154.)

44.      On October 4, 2017, a client coordinator from National Medical Review sent a

fax to Canter's treating providers at Northwest Neurology, Canter's treating providers at AMG,

and Dr. Keller, explaining that they would be receiving calls from National Medical Reviewers

Physician Advisors to discuss Canter's current medical condition and any functional limitations,

and that it was "very important that [they] take the call or return the call to assist the patient in getting disability benefits." (AR at AT&T.Canter 126 to 131, 141 to 146.)

45.     Physician Advisor, Taj M. Jiva, M.D. ("Dr. Jiva") of Network Medical Review, who is Board Certified in Internal Medicine and Pulmonary Disease, examined Canter's medical record from a pulmonary perspective and provided a written report dated October 17, 2017 of his findings. (AR at AT&T.Canter 151 to 154.)

46.     As part of his review, Dr. Jiva spoke with Dr. Kellar, who informed him that "pulmonary[-]wise [Canter] is fine and not disab[led]."  (AR at AT&T.Canter 151 to 152.)

47.     Based on his conversation with Dr. Kellar and his review of Canter's medical record, Dr. Jiva found that Canter was "not disabled from his regular job as of 7/07/17" from a pulmonary perspective, reasoning that Canter's symptoms were "self-reported and not supported by any objective physical exam findings nor diagnostic testing," and that Canter's vital signs, examination results, and test results were all normal with no evidence of acute distress.  (AR at AT&T.Canter 153.)

48.     Additionally, Physician Advisor, Mark N. Friedman, D.O., FACP, FACOI ("Dr. Friedman") of Network Medical Review, who is Board Certified in Internal Medicine and Neurology, examined Canter's medical record from an internal medicine and neurology perspective, and provided a written report of his findings on October 17, 2017.  (AR at AT&T.Canter 147 to 150.)

49.     Dr. Friedman called Northwest Neurology twice and left messages asking Ms. Jackson to return his calls, but did not speak with Ms. Jackson.  He also called AMG twice and left messages with office staff, asking Dr. Bang to return his calls, but did not speak with Dr. Bang.  (AR at AT&T.Canter 147 to 148.)

11

50.     Dr. Friedman reviewed Canter's medical records and noted that Canter's history was "significant for an anxiety disorder," but found that there was "no evidence" that Canter was disabled from his regular job since July 7, 2017.  (AR at AT&T.Canter 148 to 149.)

51.     On October 31, 2017, after reviewing Dr. Jiva's and Dr. Friedman's reports, the medical information of record, and the language of the Disability Program, on August 7, 2017, Sedgwick upheld its denial of STD benefits from July 7, 2017, onward. (AR at AT&T.Canter 119 to 120; *see also* AT&T.Canter 122 to 123.)

52.     Specifically, Sedgwick explained that the Disability Program required Canter to furnish "objective Medical Evidence" for his condition. (AR at AT&T.Canter 122 to 123.) The letter reviewed the key medical evidence Canter provided and concluded that "[a]lthough some findings [were] referenced, none [were] documented to be so severe as to prevent [Canter] from performing [his] job duties . . . with or without reasonable accommodation" since July 7, 2017. (*Id.*)

## II.     FACTS MATERIAL TO COUNT II (EQUITABLE ESTOPPEL) AGAINST AT&T SERVICES AND ITS COUNTERCLAIM (UNJUST ENRICHMENT)

53.     Illinois Bell Telephone Company ("Illinois Bell") employed Plaintiff Craig Canter ("Canter"). (*See* **Appendix Exhibit B.** Excerpts and Exhibits from the Deposition of Craig Canter ("Canter Dep.") at 38:4-12; *see also* **Appendix Exhibit C**. Declaration  of Dana Scott-WIlliams with Attached Exhibits ("S-W Decl.") ¶ 3 & Ex. 1.)

54.     AT&T Services provides payroll support services for Illinois Bell and generates pay checks based on time reporting, pay action, and reason codes and issues accompanying Statements of Earning, Taxes and Allotments ("Pay Statements") detailing those payments on the Pay Check Date as indicated on each Pay Statement. (S-W Decl. ¶ 2.)

55.     Canter did not do any work for Illinois Bell after February 6, 2017. (Canter Dep. 39:15-18.)

56.     The AT&T Integrated Disability Services Center ("IDSC") receives information regarding employee absences reported by the employee or the company by which the employee is employed. If information regarding an employee out on disability leave is received by the IDSC, a case or file is opened based on the information received, the IDSC reviews the case to determine eligibility for certain types of leave and any associated pay, if any,  and then sends, via an interface, an appropriate time code regarding the employee to the AT&T Services Payroll Department for payroll processing.  (S-W Decl. ¶ 4.)

57.     Sedgwick transmitted nightly electronic feeds to the AT&T Services Payroll Department with time coding for employees approved for STD or other benefits under the Plan, reflecting that those benefits were to be paid by the Plan.  (S-W Decl. ¶ 5.)

58.     Craig Canter's Pay Statements issued to him for the pay periods from February 5, 2017 through July 6, 2017 reflected that he was approved to receive different levels of STD benefits from the Plan.  Specifically, the Pay Statements reflect payment of "DIS/TOTAL PAID 100%" from February 13, 2017 to May 14, 2017, and then payment of "DIS/TOTAL Paid 50%" from May 17, 2017 until July 6, 2017.   Those codes showed he was paid STD benefits at 100% of his pay rate, then 50% of his pay rate. (Canter Dep. 47:14-51:7 & Ex 3 at ATT.Canter 515 to 525; S-W Decl. ¶¶ 3, 6 & Ex. 1.)

59.     While the Plan was considering whether or not to extend Canter's request for STD benefits beyond July 6, 2017, his Pay Statements reflected "DIS UNCERTIFIED." Once the Plan had made its initial decision to deny him STD benefits beyond July 6, 2017, his

paystubs reflected "DIS DENIED."  Both DIS UNCERTIFIED and DIS DENIED are unpaid

statuses so as the Pay Statements indicate, no pay was issued.  (S-W Decl. ¶¶ 1, 7 & Ex. 1.)

60.     Meanwhile, Canter's department approved him for a Denial of Disability Benefits

Leave of Absence, which provides an unpaid leave of absence to an employee who has been

denied benefits under the applicable disability benefits plan, and who has been absent from work

over 30 days. (Canter Dep. 59:2-16, 63:22-65:21; 79:4-15 & Ex. 5 (approving Canter for a

Denial of Disability Leave of Absence from July 7, 2017 through October 31, 2017), Ex. 8

(extending Canter's Denial of Disability Leave of Absence through January 8, 2018); S-W Decl.

at ¶ 8.)

61.     Canter's time coding was changed to "DDBL" from July 7, 2017 to January 7,

2018, which reflects six months of unpaid Denied Disability Leave of Absence.     The

employee's department enters certain time codes for payroll purposes and it is the code that

determines whether or not it is paid.  DDBL is an unpaid status. The employee's department

cannot authorize pay for a DDBL.  As Canter's Pay Statements reflect, no pay was issued to

Canter for DDBL. His Pay Statement for the period of  December 10 to December 23, 2017 does

reflects a one-time bonus of $1,000 based on his job title, which he received even though he was

out on leave at that time.  (S-W Decl. ¶¶ 3, 8 & Ex. 1 at AT&T.Canter 508-509.)

62.     In early February 2018, after the maximum time allowed for Canter to be on a

Denial of Disability Benefits Leave of Absence had expired, Canter's department instructed that

the "DDBL" time code be removed.  (**Appendix Exhibit D.** Excerpts and Exhibits from the

Deposition of Sheri Goorsky ("Goorsky Dep.") at 7:11-14; 63:11-18 (referring to this code as a

DDLOA or "Denied Disability Leave of Absence"); *see also* **Appendix Exhibit E.** Excerpts and

Exhibits from the Deposition of AT&T Services, Inc. (Joshua Hampshire) ("AT&T Services Dep.") at 40:20-41:4 & Ex. 4.)

63.     Sheri Goorsky transmitted the instructions on coding, but does not make decisions about eligibility for leave, leave type or whether a leave type is paid or unpaid. (Goorsky Dep. at 8:14-17, 20-21 and 48:17-18 ("I don't inquire about pay.  It is not my responsibility. . . .").)

64.     A human resources associate in in the Data Management Center processed the instruction from Canter's department to remove the "DDBL" time code on February 5, 2018, which happened to be the payroll close date for the payroll period ending February 3, 2018. A the "DDBL" code was deleted and before any replacement code was entered, the payroll system ran the payroll calculations for the payroll period closing that day. Because a new code had not yet been entered, payroll system defaulted to wages and automatically generated regular wages and holiday pay for Canter for the period of time from September 13, 2017 to February 3, 2018. (S-W Decl. ¶ 9.)  This resulted in an erroneous wage payment to Canter in the gross amount of $31,543.90 on February 9, 2018.  (S-W Decl. ¶¶ 3, 10 & Ex. 1 at AT&T.Canter 507.)

65.     The Pay Statement issued to Canter for the February 9, 2018 erroneous payment reflected a payment for "Regular" and "Holiday Allowance" wages (just as he received when he was reporting to work) and details pay periods from June 25, 2017 through February 3, 2018.  It did not reflect payments for disability benefits under the Plan (which would have codes such as "DIS/TOTAL PAID 100%" or "DIS/TOTAL Paid 50%").  (S-W Decl. ¶¶ 3, 11 & Ex. 1 at AT&T.Canter 507, 517, 520, 526.)

66.     On February 9, 2018, the correct time code for Canter was entered and his record was properly updated to change the time code for the period of time from September 13, 2017 to February 3, 2018 to Disability Denied ("DISD"). DISD is an unpaid status.  However, gross

15

wages of $31,543.90 for this time period had already been processed for Canter on February 5, 2018 and were already issued to Canter on February 9, 2018. (*See* S-W Decl. ¶¶ 3, 12 & Ex. 1 at AT&T.Canter 507.)

67.     Canter's February 23, 2018 Pay Statement reflects the correction from regular or holiday wages to DISD for the pay periods from June 25, 2017 through February 3, 2018. It also indicates Overpayment Offset, which specifically noted reversing the Overpayment of $31,543.90. (S-W Decl. ¶¶ 3, 13 & Ex. 1 at AT&T.Canter 506.)

68.     On February 26, 2018, AT&T Services sent Canter a letter notifying him of the $31,543.90 overpayment (representing 1168 regular hours and 40 holiday hours) and gave Canter several different options for how to repay it. (Canter Dep. at 107:24-113:03, 114:22-25 & Ex. 13; *see also* S-W Decl. ¶¶ 14-16 & Ex. 2.)

69.     The letter also explained that if Canter repaid the overpayment in 2018, "taxes previously withheld [would have been] deducted from [his] balance lowering the amount due." But, if he did not make repayment in 2018, the taxes withheld from the payment on Canter's behalf would be submitted to the federal and state governments and Canter would be obligated to repay the entire amount.  In turn, AT&T Services would report the difference on a Form W-2c – Corrected Wage and Tax Statement, permitting Canter to potentially recover the withheld amounts directly from the taxing authorities.  (*See* S-W Decl. at ¶¶ 15-16 & Ex. 2; *see also* Canter Dep. at 107:24-113:03 & Ex. 13.)

70.     AT&T Services again sent letters to Canter demanding repayment and providing instructions as to how to do so on March 13, 2018 and May 15, 2018. (*See* S-W Decl. ¶¶ 18-20 & Ex. 3; Canter Dep. 123:9-124:14; 125:4-18 & Exs. 15, 16.)

71.     The payroll department also demanded that Canter repay the money in at least one telephone conversation with Canter. (*See* Canter Dep. at 119:19-121:25.)

72.     Canter has not repaid any portion of the February 9, 2017 overpayment or sought to work out any payment arrangement. (Canter Dep. at 122:5-10; S-W Decl. ¶¶ 21-22.)

73.     Because he did not repay the money in 2017, it was reported as income for that year and included on his W-2. (S-W Decl. ¶ 21.)

74.     On February 13, 2018, after Canter received the mistaken payment, he combined the net amount of the check ($14,891.84) with $26,000 that was in his account and purchased a $40,000 certificate of deposit of which he is the beneficiary.  (Canter Dep. 173:2-6.)

75.     After the expiration of Canter's six month Denial of Disability Benefits Leave of Absence, Canter requested additional time off work as job accommodation and the IDSC, which is administered by Sedgwick, notified him that additional time off work was approved. (*See* Canter Dep. at 88:2-89:3 & Ex. 9.)

76.     The process of requesting a job accommodation was separate from the claim for STD benefits and, on January 16, 2018, the IDSC provided Canter with some forms to complete to support his request, specifically, an "Authorization to Release Health Care Information for an ADA Job Accommodation" that the employee completes, an "Employee Request for ADA Job Accommodation Form" and Healthcare Provider Instructions for the Healthcare Provider to complete. The IDSC did not request or require objective medical evidence. (*See* AT&T Services Dep. at 60:5-20.)

77.     After the IDSC received the requested forms, it wrote Canter on February 2, 2018, informing him that after review of his job accommodation request and the medical information provided, a proposed accommodation of "time off work from July 31, 2017 to July 31, 2018"

17

would be communicated to his supervisor; however, it was up to Canter's department to determine if the time off could be reasonable accommodated without undue hardship. (*See* Canter Dep. at 104:4-106:12 & Ex. 12 at AT&T.Canter 880.)

78.     On February 19, 2018, the IDSC communicated to Canter that it had received the decision from his department that it was able to provide a reasonable accommodation of time off work from July 31, 2017 to July 31, 2018. The letter says nothing about being paid for the time off and  Canter admits no one ever told him that his additional approved time off work would be paid. (*See* Canter Dep. at 101:6-18, 104:4-106:12 & Ex. 12 at AT&T.Canter 863.)

Respectfully submitted,

/s/*Sarah Bryan Fask*
Sarah Bryan Fask

Sarah Bryan Fask, Esq.
Admitted *pro hac vice*
LITTLER MENDELSON, P.C.
1601 Cherry Street, Suite 1400
Philadelphia, PA  19102.1321
267.402.3000
sfask@littler.com

Kyle J. Mueller, Esq.
LITTLER MENDELSON, P.C.
321 North Clark Street
Suite 1000
Chicago, IL 60654
312.795.3229

Dated: August 14, 2020