UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CRAIG CANTER, | ) |
| | ) |
| Plaintiff, | ) Case No. 18 C 7375 |
| | ) |
| v. | ) Judge Jorge L. Alonso |
| | ) |
| AT&T UMBRELLA BENEFIT | ) |
| PLAN NO. 3, and | ) |
| AT&T SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

After his short-term disability benefits were discontinued, plaintiff Craig Canter ("Canter") filed a two-count complaint against defendants AT&T Umbrella Benefit Plan No. 3 (the "Plan")[1] and AT&T Services, Inc., which is the Plan Administrator. The parties have filed cross motions for summary judgment. For the reasons set forth below, the Court grants in part and denies in part defendants' motion [95] for summary judgment. The Court denies plaintiff's motion [106] for summary judgment.

**I. BACKGROUND**

The following facts are undisputed and are within the administrative record unless otherwise noted.[2]

---

[1] Plaintiff originally named AT&T Midwest Disability Benefits Program as the Plan defendant, but the parties filed a stipulation [19] that the proper Plan defendant is AT&T Umbrella Benefit Plan No. 3.

[2] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems

Defendant AT&T Umbrella Benefit Plan No. 3 (the "Plan") is a welfare plan under ERISA. Defendant AT&T Services, Inc. ("AT&T") is the Plan Administrator. Section 8.1 of the Plan provides:

> The Plan Administrator has the sole and absolute discretion to interpret the provisions of the Plan, to resolve any ambiguity in the terms of the Plan, to make findings of fact, to determine the rights and status of you and others under the Plan, to decide and resolve disputes under the Plan and to delegate all or a part of this discretion to third parties, who may be individuals and/or entities. To the extent permitted by law, such interpretation, findings, determinations and decisions are final, conclusive and binding on all persons for all purposes of the Plan and shall not be overturned, unless determined to be arbitrary and capricious pursuant to final judgment in a court of law.

Plan § 8.1. The Plan Administrator delegated to Sedgwick Claims Management Services, Inc. ("Sedgwick") its discretion to determine a claimant's entitlement to short-term disability ("STD") benefits. Sedgwick is an independent, third-party administrator. The Summary Plan Description ("SPD") states, "Only the Claims Administrator has the discretion to determine whether you have a disability." (SPD at 13/Docket 100-1 at 225). The SPD also gives Sedgwick "discretion and authority to decide appeals" and states that Sedgwick's decision on appeals is "final and conclusive."

The Plan provides up to 52 weeks of STD benefits if the claims administrator "at its sole discretion, determines that you are disabled by reason of sickness, pregnancy, or an off-the job illness or injury that prevents you from performing the duties of your job or any other job assigned by the participant's company with or without a reasonable accommodation." (SPD at

---

the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Furthermore, the Court does not consider facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.

6/Docket 100-1 at 218). The SPD states that a claim for disability "must be supported by objective Medical Evidence." (SPD at 6/Docket 100-1 at 218). The SPD defines objective medical evidence as "[o]bjective medical information sufficient to show that the Participant is Disabled" and "includes, but is not limited to, results from diagnostic tools and examinations performed in accordance with the generally accepted principles of the health care profession." (SPD at 37/Docket 100-1 at 249). The SPD also states, "[i]n general, a diagnosis that is based largely or entirely on self-reported symptoms will not be considered sufficient to support a finding of Disability." (SPD at 37/Docket 100-1 at 249). The SPD lists failure "to furnish objective Medical Evidence" as a reason "Your Short Term Disability Benefits May Be Discontinued." (SPD at 17/Docket 100-1 at 229).

Plaintiff Craig Canter ("Canter") was a participant in the Plan by virtue of his employment with Illinois Bell Telephone Company, a subsidiary of a subsidiary of defendant AT&T. Plaintiff's position was Premises Technician, the duties of which included stooping, crouching, bending, kneeling, crawling, using and/or wearing appropriate safety equipment, following safety practices and installing wire at customers' locations. The position required lifting up to 80 pounds, climbing ladders up to 28 feet, climbing telephone poles, wearing a body belt with tools weighing fifteen pounds and the ability to drive a company vehicle. Plaintiff put forth undisputed evidence that he climbed telephone poles at least seven times per day, but that evidence is outside of the administrative record.

On February 13, 2017, plaintiff submitted a claim for STD benefits under the Plan. In support of his claim, plaintiff supplied three pieces of medical evidence. First, plaintiff supplied notes by Tracy Denne, P.A. of Advocate Medical Group ("Advocate") from a February 7, 2017 visit, during which plaintiff complained of dizziness, persistent headache and back pain. Next,

3

plaintiff supplied his February 7, 2017 discharge summary from Centegra Hospital Emergency Department ("Centegra"), where plaintiff complained of headaches and underwent a CT scan. Centegra sent plaintiff home with Neproxen for pain and told him to follow up with his health care provider if his headaches did not improve. Finally, plaintiff submitted notes from his February 11, 2017 visit with Dr. Moriah Bang, D.O., of Advocate. Plaintiff had complained to Dr. Bang about dizziness, persistent headaches and low back pain. Dr. Bang referred plaintiff to a neurologist.

Pursuant to that referral from Dr. Bang, plaintiff saw Manisha Sahay, M.D. ("Dr. Sahay"), of Northwest Neurology, Ltd ("Northwest Neurology") on February 15, 2017. Dr. Sahay ordered an MRI and MRV of plaintiff's head. Dr. Sahay also wrote a note recommending that plaintiff be excused from work due to dizziness pending the results of the tests. She noted that plaintiff would return to Northwest Neurology for a follow-up appointment in two weeks.

On February 22, 2017, Sedgwick approved plaintiff's claim for STD benefits from February 13, 2017 through March 14, 2017. In doing so, Sedgwick noted plaintiff had been light headed and had experienced headaches. Sedgwick found it "reasonable to approve benefits as [plaintiff] would not be safe to climb, lift or drive."

On March 8, 2017, plaintiff saw Lisa Jackson, CNP ("Jackson") at Northwest Neurology. She noted that plaintiff continued to experience daily, off-and-on headaches with lightheadedness. She also noted that the results of his February 15, 2017 tests were "unremarkable" and that the CT scan from the emergency room had been normal. Jackson and Dr. Sahay changed plaintiff's medication and recommended that he remain out of work until his return visit four weeks later.

Sedgwick received the notes from the March 8, 2017 visit and extended plaintiff's STD benefits until April 11, 2017. In so doing, Sedgwick noted that plaintiff continued to experience light headedness and headaches and was taking cyclobenzaprine for back pain. Sedgwick concluded it was "reasonable to approve benefits" because plaintiff "would not be safe to climb, lift or drive."

On April 10, 2017, plaintiff returned to Northwest Neurology for a follow-up visit with Jackson. Jackson noted that plaintiff's headaches had "nearly resolved" since he began taking propranolol. She also noted that plaintiff still complained of "lightheadedness and mild headache with any physical exertion." Jackson (overseen by Daniele Anderson, M.D.) both: (1) noted that plaintiff's dose of medication had just recently increased; and (2) recommended that plaintiff continue the higher dose before returning for a follow-up visit in three or four weeks.

Based on Jackson's notes of the April 10, 2017 visit, Sedgwick again extended plaintiff's STD benefits, this time until May 10, 2017. Sedgwick noted it was "reasonable to extend benefits" because plaintiff "still has lightheadedness" such that it "would not be safe to climb, lift or drive and [he] would need time to adjust to medication."

Plaintiff saw Jackson at Northwest Neurology again on May 8, 2017. Jackson noted that plaintiff's "headaches had improved significantly" but that his "lightheadedness is worse." Jackson recommended a return visit in three to four weeks. Based on this information, Sedgwick approved plaintiff's STD benefits through May 29, 2017. In doing so, Sedgwick noted that "clinical information substantiate[s] the severity of [plaintiff's] condition and his inability to drive[,] climb, push/pull."

On June 5, 2017, plaintiff again returned to Northwest Neurology for a visit with Jackson. Plaintiff reported to her that acupuncture and an herbal supplement had improved his

"lightheadedness, headaches, and motivation to get up and work." Jackson recommended a follow-up visit in three to four weeks. Based on this information, Sedgwick again approved plaintiff's STD benefits through July 6, 2017. Sedgwick concluded it was "[r]easonable to extend benefits as [plaintiff] would not be safe to climb, drive, push/pull" and "would need time to see if increase in medication [would] take effect."

On July 10, 2017, Sedgwick requested an update. Jackson submitted her notes from plaintiff's July 3, 2017 visit. Jackson's notes stated that plaintiff "has significant improvement of his headaches." Jackson noted that plaintiff's "persistent dizziness has resolved" and that plaintiff could do normal activities of daily living without difficulty. Jackson also noted that "with exertion, such as mowing the lawn this weekend, he became short of breath and dizzy after five minutes." Jackson referred plaintiff back to his primary care physician, theorizing that the dizziness with exertion "could be due to a cardiopulmonary problem." Jackson recommended a neurology follow-up appointment in two to three months.

Sedgwick reviewed Jackson's notes. Sedgwick noted that plaintiff's "exam findings [were] within normal limits" and that plaintiff "denie[d] poor balance [and] coordination." Sedgwick noted Jackson's theory that lightheadedness after exertion could be caused by a cardiopulmonary problem. Sedgwick decided to refer plaintiff's case to an independent medical reviewer. Katherine Duvall, M.D., ("Dr. Duvall") of Network Medical Review Co., Ltd. ("Network Medical") reviewed Jackson's notes from the July 3, 2017 visit. Dr. Duvall, who is Board Certified in Occupational Medicine, concluded that plaintiff was not disabled, explaining:

> The records indicate the employee has been see[n] for headaches and dizziness. It is noted that he had significant improvement of his headaches, only having a mild headache every few days, which she does not treat. Dizziness had resolved, neck pain improved, and back pain resolved. Complaints of shortness of breath and dizziness with exertion. However, there were no abnormalities on exam, and he was in no acute distress. Furthermore, the objective findings at this time are

6

> insufficient to support inability to do his usual heavy job or need restrictions and limitations for review period.
>
> Therefore, from an Occupational Medicine perspective, the employee would be capable of performing his normal heavy job including duties of lifting, driving, bending, and stooping as a Premises Tech, without restrictions/limitations from 07/07/17 to present.

(AT&T Canter 0000227/Docket 100-8 at 30). Before issuing her report, Dr. Duvall attempted to reach Northwest Neurology but did not receive a return call in time.

Based on this report from Dr. Duvall and its review of Jackson's notes, Sedgwick decided to deny plaintiff STD benefits as of July 7, 2017. Sedgwick notified plaintiff of the decision by letter on August 7, 2017. In the letter, Sedgwick explained that it needed "objective Medical Evidence" to support a disability claim and that the "[c]linical information provided and reviewed does not document a severity of your condition(s) that supports your inability to perform your essential job duties as a Premise[s] Technician."

On September 1, 2017, plaintiff supplied additional medical records from a July 19, 2017 visit with Dr. Bang of Advocate. Dr. Bang had ordered fasting blood tests, a stress echocardiogram and a chest x-ray. The results of those tests were normal (except for plaintiff's cholesterol and triglyceride levels). At that point, Dr. Bang referred plaintiff to a pulmonologist to "make sure [plaintiff's] heart and lungs [were] okay" after a "thorough negative neuro workup." Sedgwick reviewed this information and concluded that the new information did not include evidence of disability and did not change the prior denial. Sedgwick informed plaintiff on September 12, 2017 that it had not changed its decision to discontinue STD benefits as of July 7, 2017.

On September 20, 2017, plaintiff timely appealed the denial of STD benefits. Plaintiff submitted records from his visit with a pulmonologist (to which Dr. Bang had referred him). The

7

pulmonologist, Dennis F. Kellar, M.D. ("Dr. Kellar") had ordered a stress echocardiogram, which was normal. Dr. Kellar had also ordered a pulmonary function test ("PFT"), about which he noted "12% reversibility, suspect component of mild reactive airway[.]" Dr. Kellar noted that plaintiff was sent home with a unit to test his sleep to determine whether sleep apnea was causing headaches.

On October 2, 2017, Sedgwick telephoned plaintiff. Among other things, Sedgwick told plaintiff that it would submit his file to an independent physician for medical review. Sedgwick told plaintiff the independent physician would attempt to reach his treating physicians. Sedgwick then engaged two independent medical reviewers to opine as to whether plaintiff was disabled from his job. On October 4, 2017, Sedgwick sent a facsimile message to plaintiff's providers at Northwest Neurology and Advocate to let them know the independent medical reviewers would attempt to reach them.

One of the two independent medical reviewers hired by Sedgwick was Taj M. Jiva, M.D. ("Dr. Jiva"), who is Board Certified in Internal Medicine and in Pulmonology Disease. Dr. Jiva reviewed plaintiff's medical records and spoke with Dr. Kellar. Dr. Jiva concluded that plaintiff was not disabled, explaining, among other things:

> **SUMMARY OF CONVERSATION:** Dr. Kellar said that the claimant referred to him for work up of intractable headaches, and possible sleep apnea. He underwent cardiopulmonary stress testing which showed only deconditioning. His PFTs, showed reactive airways disease with 12% with bronchodilators. Pulmonarywise he is fine and not disability. His polysomnography is pending for work up of his headaches.
>
> **PULMONARY DISEASE SYNOPSIS:** This review is from a Pulmonary Disease perspective. I reviewed the claimant's job description. The time period under review is from 07/07/17 through present. The claimant is male . . . who is employed as a Premises Technician. Job duties climb, lifting, drive, and bending. His listed diagnoses are tension headaches, migraines and shortness of breath.

8

> Per review of medical records, on 7/29/17, the claimant was seen for shortness of breath, dizziness, and headaches on exertion since February 2017. Vital signs were stable. No acute distress. Physical exam was normal. There was no respiratory distress, respiratory effort was normal, no use of accessory muscles. Assessment was shortness of breach. Plan was stress echo, CMP, ECG, chest x-ray, and pulmonary referral. His headaches improved with Propranolol.
>
> On 9/12/17, Dr. Dennis Kellar saw the claimant in pulmonary consultation for migraines/dizziness. He reported shortness of breach after walking 2 miles and mowing the lawn. PFTs were essentially normal. He smokes half to one pack a day of cigarettes since 1987. Vital signs were stable. Spo2 was 98% on room air. Physical exam was normal. Assessments were chronic headaches, shortness of breath, hypoventilation, and dyspnea on exertion. Plan was sleep study, CPX study showed deconditioning but no ischemia. Chest x-ray showed no acute disease. ESR was normal.

(AT&T Canter 0000137). Dr. Jiva noted that plaintiff's symptoms were "self-reported and not supported by any objective physical exam findings nor diagnostic testing." Dr. Jiva concluded, "There are no clinical findings contained in the medical record that would impact the employee's ability to function."

The other independent doctor Sedgwick engaged for an opinion was Mark N. Friedman, D.O. ("Dr. Friedman"). Dr. Friedman is Board Certified in Internal Medicine and Neurology. Dr. Friedman attempted to reach plaintiff's providers by phone but did not speak to them. He spoke only to Dr. Katsamakis (who was listed in the records), but that doctor noted that only Jackson had met with plaintiff. Dr. Friedman did not reach Jackson. (Plaintiff put forth undisputed evidence that Northwest Neurology attempted to reach Dr. Friedman three times before leaving a message, but that evidence is outside of the administrative record.) Dr. Friedman reviewed plaintiff's medical records and provided Sedgwick a written report in which he opined that "no evidence" supported plaintiff's claim of disability after July 7, 2017. Specifically, Dr. Friedman explained:

> The claimant is a Premises Technician with job duties climb, lifting, drive, and bending with recurrent bitemporal headaches since 2/5/17. He also reported a

9

history (2017) of shortness of breath and dizziness on exertion. His medical history is significant for an anxiety disorder. There is no evidence in the available medical records that the employee was disabled from his regular job as of 7/7/17 through the present. The plan or return to work included continuing propranolol for headache prophylaxis and for the employee to be evaluated for possible sleep apnea as a potential cause for his chronic headaches.

There is no evidence in the available medical records that the employee was disabled from his regular job as of 7/7/17 through the present.

(AT&T Canter 0000149).

After reviewing the medical records and the reports from Drs. Friedman and Jiva, Sedgwick denied plaintiff's appeal. Sedgwick informed plaintiff of the decision by letter on October 31, 2017. In the letter, Sedgwick explained:

> You are considered Disabled for purposes of Short-Term Disability Benefits if the Claims Administrator determines that you are Disabled by reason of sickness, pregnancy, or an off-the job illness or injury that prevents you from performing the duties of your job (or any other job assigned by the Company for which you are qualified with or without a reasonable accommodation. Your Disability must be supported by objective Medical Evidence.

> The Unit and the independent specialists reviewed medical information from Lisa Jackson, CNP; Marisha Sahay, M.D.; Gregory Katsamakis, M.D.; Advocate Medical Group; Moriah Bang, D.O; Tracy Denne, PA; Centegra Hospital Huntley; Lake Barrington MRI; Dennis F. Kellar, M.D.; Advocate Good Shepherd Hospital; Katherine Duvall, M.D. dated February 7, 2017 through September 12, 2017.

> Mark N. Friedman, D.O., Board Certified in Internal Medicine and Board Certified in Neurology conducted a review of the medical records on file as part of the appeal process. Dr. Friedman attempted to speak to Lisa Jackson, CNP; Dr. Bang and Tracy Denne, PA-C but did not receive a call back. The specialist noted that you are a Premises Technician with recurrent bi-temporal headaches since February 5, 2017 and you also reported a history (2017) of shortness of breath and dizziness on exertion. The specialist noted that there is no evidence in the available medical records that you are disabled from your regular job as of July 7, 2017 through present and the plan or return to work included continuing propranolol for headache prophylaxis and for you to be evaluated for possible sleep apnea as a potential cause for your chronic headaches. The specialist concluded that there is no evidence in the available medical records that you were disabled from your regular job as of July 7, 2017 through present.

> Taj. M. Jiva, M.D., Board Certified in Pulmonary Disease also conducted a review of the medical records on file as part of the appeal process. Dr. Jiva spoke to Dr. Kellar and noted that you are a Premises Technician. The specialist noted that you reported shortness of breath, but you were not in acute respiratory distress. Your vital signs were stable; you had no acute distress. The physical exam was normal; there was no respiratory distress, respiratory effort was normal, no use of accessory muscles. Subsequently, you reported that you had shortness of breath after walking 2 miles and mowing the lawn. The specialist noted that your PFTs were essentially normal; you smoke half to one pack a day of cigarettes since 1987; your oxygen level was 98% on room air; your CPX study showed deconditioning but no ischemia; chest x-ray showed no acute disease and ESR was normal. The specialist concluded that from a pulmonary perspective, you are not disabled from your regular job as of July 7, 2017 through present.
>
> Although some findings are referenced, none are documented to be so severe as to prevent you from performing the job duties of PREMISES TECHNICIAN 1&2 [IBEW21] with or without reasonable accommodation from July 7, 2017 through present.

(AT&T Canter 0000122).

The following facts are undisputed and outside the administrative record unless otherwise noted. Back in July 2017, when plaintiff's STD disability benefits were first denied, plaintiff's department approved him for a "Denial of Disability Leave of Absence," which basically meant he was given an unpaid leave of absence while he worked out his disability status through the appeal process. That leave of absence was scheduled to end January 7, 2018, i.e., six months after plaintiff's STD benefits were discontinued.

On January 8, 2018, plaintiff returned to his job site. Plaintiff, though, did not have in his hand a note from his doctor releasing him for work. Plaintiff's supervisor sent him home and told him he could apply for a job accommodation. As it turns out, Sedgwick is also involved when an employee requests an accommodation. Plaintiff asked Sedgwick for an accommodation application, which plaintiff filled out.

On February 2, 2018, Sedgwick sent plaintiff a letter about his accommodation request. In the letter, Sedgwick informed plaintiff that it had informed plaintiff's supervisor of a proposed accommodation of time off from work from July 7, 2017 through July 31, 2018. The letter stated, "Your department must still review the request and determine whether it can be reasonably accommodated without creating undue hardship. Please contact your supervisor for the status of this decision." (Docket 108-4 at 34). By February 16, 2018, plaintiff's department had approved the leave of absence as a job accommodation.

In the meantime, on February 9, 2018, AT&T, which handled payroll for Illinois Bell Telephone Company, issued plaintiff a payroll check in the amount of $14,891.54 for "Regular" and "Holiday Allowance" pay for the period of June 25, 2017 through February 3, 2018. The gross amount, before taxes and other deductions, of the payment was $31,543.90. On February 26, 2018, AT&T sent plaintiff a letter notifying him that the payment had been in error and that the payment must be returned. Plaintiff did not return the money.

## II.   STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a

jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). When "the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of finding in favor of the non-movant on the claim. If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71 Mezz Lender LLC v. The National Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citations omitted).

### III. DISCUSSION

#### A. Plaintiff's claim for benefits

In Count I, pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), plaintiff seeks relief for denial of STD benefits after July 7, 2017. ERISA § 502(a)(1)(B) provides a cause of action for participants and beneficiaries of ERISA plans "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). A district court reviews a "denial of benefits challenged under § 1132(a)(1)(B) . . . under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

Where, as here, the plan grants such discretionary authority, the Court reviews the denial of benefits under the deferential arbitrary-and-capricious standard. *Geiger v. Aetna Life Ins. Co.*, 845 F.3d 357, 362 (7th Cir. 2017).[3] "Deferential review of an administrative decision means review on the administrative record." *Perlman v. Swiss Bank Corp. Comprehensive Dis. Prot.*

---

[3] The parties agree that deferential review applies in this case.

13

*Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999).  Thus, when considering whether the decision to discontinue plaintiff's benefits was arbitrary and capricious, the Court will not consider information outside the administrative record.

> Under deferential review, the Court:
>
> must uphold the decision so 'long as (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'

*Rabinak v. United Bhd. of Carpenters Pens. Fund*, 832 F.3d 750, 753 (7th Cir. 2016) (quoting *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010)).  Such review, however, is not a rubber stamp.  *Holmstrom*, 615 F.3d at 766.

In this case, it is possible to offer a reasoned explanation, based on the evidence, for the denial of STD benefits after July 7, 2017, and the Plan did.  When plaintiff first applied for STD benefits based on headaches and dizziness, the Plan awarded benefits.  It continued to award benefits, several weeks at a time, until a change in the medical records.  At that point, the Plan asked an independent physician to review the case, and that doctor concluded that plaintiff was not disabled.  The Plan denied benefits.  After plaintiff appealed, the Plan considered additional evidence and asked two specialists—one in neurology and one in pulmonology—to opine as to whether plaintiff was disabled.  Both said no.  Based on the opinions from the physicians and its own review of the medical records, the Plan concluded that there was a lack of objective medical evidence—the Plan's standard—to establish disability.  That was reasonable.

More specifically, within ten days after plaintiff initially applied for STD benefits on account of headaches, back pain and dizziness, Sedgwick approved the benefits.  Sedgwick had received, among other things, notes from plaintiff's physician, Dr. Bang (to whom plaintiff had

complained about dizziness, headaches and back pain), who referred plaintiff to a neurologist. Sedgwick also had notes from plaintiff's visit to the neurologist, Dr. Sahay. Dr. Sahay ordered tests and recommended that, in the meantime, plaintiff be excused from work due to dizziness. Based on that information, Sedgwick approved STD benefits from February 13, 2017 through March 14, 2017, noting it would not be safe for plaintiff to climb or drive.

Sedgwick extended plaintiff's benefits until April 11, 2017 after seeing the notes from plaintiff's follow-up neurology visit on March 8, 2017. Although the providers noted that plaintiff's MRI and MRV results were unremarkable and that his CT scan had been normal, Dr. Sahay changed plaintiff's medication and recommended that he remain out of work. Sedgwick again extended plaintiff's STD benefits until May 10, 2017 after seeing the notes from plaintiff's April 10, 2017 neurology visit. At that visit, Jackson had noted that while plaintiff's headaches had nearly resolved, he was still lightheaded. Sedgwick decided to continue benefits based on plaintiff's recent medication increase and because the lightheadedness would make it difficult to drive and climb. Sedgwick again extended plaintiff's benefit through May 29, 2017 due to plaintiff's lightheadedness being worse and again through July 6, 2017.

In July, Sedgwick noticed a change. When Sedgwick reviewed the notes from plaintiff's July 7, 2017 neurology visit, Sedgwick saw, among other things, that plaintiff's "persistent dizziness ha[d] resolved." It was reasonable for Sedgwick to rethink benefits based on that information, because dizziness, and its effect on plaintiff's ability to drive and climb, had been the primary reason Sedgwick had given for granting benefits prior to that point. In addition, the medical providers were no longer suggesting that plaintiff remain off work until his next appointment. Jackson's notes from the July 7, 2017 visit had also mentioned that plaintiff experienced dizziness after exertion, and Jackson referred plaintiff back to his primary physician

15

to determine whether a cardiopulmonary problem might be causing the dizziness with exertion. After reviewing the notes, Sedgwick did not simply cut off plaintiff's benefits. Instead, it asked Dr. Duvall, an independent medical reviewer, to consider whether plaintiff was disabled. She opined that the medical tests did not support an inability to do the job. Sedgwick denied benefits.

After the denial, plaintiff supplied additional medical records from subsequent cardio-pulmonary tests, including a stress echocardiogram, a chest x-ray and fasting blood tests. All of those tests were normal (aside from plaintiff's cholesterol and triglyceride levels). At that point, Dr. Bang referred plaintiff to a pulmonologist, because the "thorough . . . neuro workup" had been negative. Sedgwick, finding no objective medical evidence of disability, again denied benefits.

After plaintiff appealed, Sedgwick asked not one but two additional independent physicians to opine on whether plaintiff was disabled. Both reviewed the medical records from July 7, 2017 forward and concluded that the medical results did not support a claim of disability. Sedgwick reasonably relied on those experts and its own review of the medical records in denying plaintiff's claim of disability after July 7, 2017. That was reasonable given the SPD's statement that "self-reported symptoms" would not suffice without objective medical evidence.

The question for this Court is not whether it would have awarded benefits had it been sitting in the shoes of the claims administrator. This is not *de novo* review. The question is not whether the claims administrator made a perfect decision. The question for this Court is whether the decision to deny STD benefits as of July 7, 2017 was arbitrary and capricious. Plaintiff makes several arguments that he believes show that the decision was arbitrary and capricious.

16

First, plaintiff argues that it was arbitrary and capricious for Sedgwick to discontinue plaintiff's STD benefits when there was no change in his condition. The Court does not agree that there was no change. Two things changed by July 2017. First, plaintiff's neurology provider had stopped saying that plaintiff should be off work due to dizziness pending tests or due to medication changes. Second, in the July 7, 2017 notes, plaintiff's neurology provider stated that plaintiff's "persistent dizziness had resolved." (The headaches had resolved earlier.) The provider noted that plaintiff complained of dizziness with exertion, but the provider, having noted back in March that plaintiff's neurology tests were normal, sent plaintiff back to his primary care doctor to determine whether a cardiopulmonary problem was causing the dizziness with exertion. Thus, at that point, Sedgwick had no objective medical evidence to support plaintiff's complaint of dizziness with exertion. Sedgwick did not discontinue benefits immediately; it first asked Dr. Duvall for an opinion.

As plaintiff points out, Dr. Duvall did not mention in her report that one of plaintiff's duties was climbing. That oversight is troubling, because an inability to climb on account of dizziness was a primary reason why Sedgwick had granted STD benefits before. Still, Dr. Duvall stated that no exam findings supported dizziness on exertion. In any case, to the extent it was arbitrary of Dr. Duvall not to mention climbing, the problem was cured during the appeal process. Both of the independent physicians who reviewed the files during plaintiff's appeal considered the fact that one of plaintiff's duties was driving, as did Sedgwick itself.

Plaintiff also argues Sedgwick erred in not explaining why it discounted plaintiff's complaints of dizziness with exertion. The Court does not agree. That is a subjective symptom, but the SPD requires objective evidence. Plaintiff put into the administrative record the results of the battery of tests his various providers ordered. Those tests, though, were normal. For

17

example, his neurology provider stated that his MRI and MRV tests were unremarkable and that his CT scan was normal. When neurology sent him back to his primary doctor (Dr. Bang) to determine whether a cardio-pulmonary issue could be causing dizziness upon exertion, Dr. Bang noted that the neurology workup had been "thorough" and "negative." Dr. Bang ordered, among other things, a stress echocardiogram and a chest x-ray. Those, too, were normal. Dr. Bang sent plaintiff to a pulmonologist, Dr. Kellar, who told the independent reviewer that plaintiff was fine, from a pulmonary perspective. Dr. Jiva, the independent reviewer who is Board Certified in Pulmonary Disease, said the PFTs were "essentially normal" and that there were no clinical findings to support the self-reported symptom of dizziness with exertion. She opined the plaintiff was not disabled, as did Dr. Friedman who also concluded that there was no medical evidence of disability.

Plaintiff also argues that the independent reviewers should have tried harder to reach plaintiff's providers. Plaintiff's evidence that they did not try hard enough is outside of the administrative record and cannot be considered on deferential review. In any case, plaintiff might have a better argument that the independent reviewers should have spoken to his providers if anything in the providers' notes suggested plaintiff was disabled. Plaintiff does not point out any provider who, after July 7, 2017, recommended plaintiff be off of work or stated plaintiff could not perform a function of his job.

Finally, plaintiff argues that Sedgwick's decision was arbitrary and capricious in that it "[f]ail[ed] to [o]verturn [the] [d]enial" after plaintiff's request for accommodation was approved. (Plf. Brief at 9/Docket 107 at 13). The Court does not agree. The evidence as to plaintiff's leave-of-absence accommodation (which he requested in January 2018 and was granted in February 2018) is outside of the administrative record and therefore cannot be considered on

deferential review. The appeal process for the denial of STD benefits was over in October 2017, months before plaintiff asked for the accommodation. It is simply not information the claims administrator could have taken into account when it made its decision months earlier. There is nothing arbitrary or capricious about a failure to take into account information that does not yet exist.

The undisputed facts show that the decision to deny plaintiff STD benefits after July 7, 2017 was not arbitrary and capricious. The decision survives deferential review. Accordingly, defendants' motion for summary judgment is granted as to Count I. Plaintiff's motion for summary judgment is denied as to Count I.

## B. Remaining claims

The remaining claims in this case involve the lump-sum payment AT&T made to plaintiff on February 9, 2018 in the gross amount of $31,543.90 (the net amount being $14,891.54). In Count II of his complaint, plaintiff asserts that AT&T is equitably estopped from seeking the return of the payment. AT&T filed a counter claim asserting unjust enrichment with respect to the payment.

These are state-law claims.[4] Because the Court has disposed of the only federal claim, it relinquishes jurisdiction over the remaining state-law claims. *Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("the general rule is that, when all federal

---

[4] Defendants argue that plaintiff's claim is an estoppel claim under ERISA. Plaintiff disagrees. Plaintiff has, at times during this litigation, made statements suggesting he believed the payment was STD benefits or that it was the Plan that was requesting the return of the money. The undisputed fact, though, is that the paystub stated that the payment was for wages and holiday pay from AT&T Services, Inc., which handled the payroll for plaintiff's employer. Although AT&T Services, Inc., happens also to be the Plan Administrator, there is no evidence that the Plan was involved in the payment. Plaintiff has, if anything, a state-law claim for equitable estoppel.

claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits"); *see also Donald v. Wexford Health Services, Inc.*, 982 F.3d 451, 461 (7th Cir. 2020). Plaintiff's Count II and AT&T's counterclaim are dismissed without prejudice. Accordingly, defendants' motion to file surreply is denied as moot.

IV. **CONCLUSION**

For the reasons set forth above, the Court denies defendants' motion [121] to file surreply. The Court denies plaintiff's motion [106] for summary judgment. The Court grants in part and denies in part defendants' motion [95] for summary judgment. Defendants are granted summary judgment as to Count I. The remaining claims are dismissed without prejudice. Civil case terminated.

SO ORDERED. ENTERED: February 19, 2021

JORGE L. ALONSO
United States District Judge